# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. PAYAN,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>H. TATE, et al.,<br><br>　　　　Defendants. | 1:13cv00807 LJO DLB PC<br><br>**FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION TO DISMISS**<br>(Document 17)<br><br>**THIRTY-DAY OBJECTION DEADLINE** |

Plaintiff Michael J. Payan ("Plaintiff"), a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action on May 28, 2013.  This action is proceeding on the following cognizable claims: (1) retaliation in violation of the First Amendment by Defendants Bingamon, Tate and Vu; and (2) deliberate indifference to a serious medical need in violation of the Eighth Amendment against Defendants Bingamon, Tate, Vu, Sheisha and Joaquin.

On April 16, 2014, Defendants filed a motion to dismiss the Eighth Amendment claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiff filed his opposition on June 2, 2014, and Defendants filed their reply on June 5, 2014.  The motion is deemed submitted pursuant to Local Rule 230(l).

A.   **ALLEGATIONS IN COMPLAINT**

Plaintiff is currently incarcerated at Pelican Bay State Prison.  The events complained of occurred at California Correctional Institution, where the events at issue occurred.

Plaintiff alleges that he lost balance and fell in the shower on July 21, 2010.

Plaintiff was seen by Defendant Bingamon on August 11, 2010.  Plaintiff told Defendant Bingamon that he felt a painful tear in his left shoulder when he fell, and that he could not use his left arm or sleep because of pain.  Defendant Bingamon told Plaintiff that he had a torn tendon in his rotator cuff and that he would order an x-ray.  Plaintiff told him that prior doctors have said that x-rays were not sufficient to detect tendon or muscle injuries, and he asked for an MRI.  Defendant Bingamon got upset and told Plaintiff that he was careless, and he was lucky he was getting an x-ray.

Plaintiff saw Defendant Bingamon again on September 29, 2010.  He told Plaintiff that the x-ray did not pick up any tears in the tendon.  Defendant Bingamon indicated that he would order a steroid injection and prescribe Gabapentin, to which Plaintiff objected.  Defendant Bingamon told Plaintiff that if he did not consent to the injection and Gabapentin, he would terminate the appointment and Plaintiff would forfeit all medical attention.  Plaintiff said that he did not want to forfeit medical care and Defendant Bingamon told him that he should not make a habit of complaining about medical care.

Plaintiff took Gabapentin, which made him feel sick and did not relieve the pain.

Plaintiff returned to Defendant Bingamon on October 20, 2010.  Defendant Bingamon told Plaintiff that because of his complaints, his supervisor, Defendant Tate, got upset and discontinued Gabapentin because it was not for torn tendons.  Defendant Bingamon told Plaintiff that he would be scheduled for an injection and physical therapy, and if there was no improvement, an MRI.  Defendant Tate confirmed this plan and gave Plaintiff an injection. Defendant Tate told Plaintiff that he was scheduled for an MRI to get a proper diagnosis.

Plaintiff asked how Defendant Tate knew where to locate the injection, but he refused to answer and sent Plaintiff back to his cell.

On November 2, 2010, Plaintiff returned to Defendant Bingamon and reported that he could not use his left arm and that he was in extreme pain.  Plaintiff said that the injection did not work and requested an MRI.  Defendant Bingamon became angry and told Plaintiff that he wasn't going to treat Plaintiff because of his complaints.

On or around December 2, 2010, Plaintiff saw Defendant Tate.  Defendant Tate told Plaintiff that he hated whiners and inmates who told doctors what to do, and that an MRI wasn't worth the five dollars that it would cost Plaintiff.  Defendant Tate told Plaintiff that if he continued to complain, he would cancel the MRI.

On December 15, 2010, Plaintiff filed a medical care grievance regarding Defendant Tate's medical treatment and threats.  On January 4, 2011, Defendant Sheisha, the Chief Physician, interviewed Plaintiff at the Second Level.  Plaintiff reiterated his complaints about Defendant Tate and told Defendant Sheisha that he believed he had a torn tendon.  Defendant Sheisha told Plaintiff that he wasn't the first one to complaint about Defendant Tate, but that the medical staff doesn't get paid enough to look into petty matters.  Defendant Sheisha turned the grievance into a staff complaint and ended the interview.  In the Second Level response, Defendant Joaquin, the Chief Medical Officer, only reiterated part of the interview and implied that because an inquiry was done, the inquiry partially granted the complaint.  Plaintiff believes that Defendants Sheisha and Joaquin deliberately turned Plaintiff's grievance into a staff complaint to make the complaint confidential and to allow for the continuation of improper treatment.

After Plaintiff filed his grievance against Defendant Tate, Defendant Tate recommended that the MRI be disapproved.

On January 5, 2011, Defendant Sheisha gave Plaintiff a second steroid injection. Plaintiff told Defendant Sheisha that the previous injection did not work and that the pain was worsening. Plaintiff said that he did not consent to the injection because it was being performed without an MRI. Defendant Sheisha told Plaintiff that if he did not consent, he would be charged with interfering with medical staff orders and would not receive any treatment at all. Plaintiff consented to the injection out of fear.

Plaintiff did not experience any relief after the second injection.

On March 9, 2011, Plaintiff saw Defendant Bingamon and reported that his shoulder was in constant pain. Defendant Bingamon told Plaintiff that he had upset his supervisor, Defendant Tate, because of the grievance, and that he wasn't going to "go against his supervisor." Compl. 10. He sent Plaintiff home.

On April 11, 2011, Plaintiff filed out a Health Care Request Form and indicated that he was still experiencing pain.

On May 4, 2011, Plaintiff saw Defendant Vu and told him of his dissatisfaction with his prior care. Defendant Vu looked at Plaintiff's prior grievances and told Plaintiff that he should not complain about the people that have "the keys to his life." Compl. 11. He told Plaintiff that he needed an MRI, but that because of the problems that Plaintiff had caused, he'd have to go through shots and physical therapy first. Plaintiff told Defendant Vu that he had already had two shots and that they did not work, but Defendant Vu said that this was the only way that Plaintiff would be given an MRI.

Plaintiff was not seen again until December 1, 2011. During that time, he continued to complain in medical requests of severe pain and limited use of his shoulder.

When Plaintiff saw Defendant Vu on December 1, 2011, he continued to complain of pain and asked for an MRI. Defendant Vu said that CDCR policy prevents him from ordering an MRI without prior x-rays, shots, physical therapy and another shot. Plaintiff told Defendant Vu

4

that the prior injections did not work and asked for a copy of the cited policy. Defendant Vu became angry and told Plaintiff that he would take the injections or nothing at all.

On December 16, 2011, Plaintiff saw Defendant Sheisha and received an injection even though he pleaded for an MRI. Defendant Sheisha told him that if he did not consent to the injections, then he would receive no treatment at all.

On January 10, 2012, Plaintiff submitted a Health Care Request Form because he experienced a painful tear in his shoulder.

He was seen by Defendant Vu on January 24, 2012. Plaintiff's neck and shoulder were swollen and he had no mobility without pain. He requested stronger pain medication and an MRI because the injections were making his shoulder worse. Defendant Vu told Plaintiff that he was not a doctor, and that he would continue to treat him pursuant to policy even if the injections were not working.

On February 16, 2012, Plaintiff submitted a Health Care Request Form due to extreme pain and clicking noises in his shoulder. He submitted additional requests on March 26 and April 26, 2012, after he was not seen. Plaintiff filed another grievance on April 5, 2012.

Plaintiff was seen by Defendant Vu on April 27, 2012, and complained of worsening shoulder pain. Defendant Vu told Plaintiff that he should never have filed a grievance on him, and that although he did need an MRI, he was going to note that Plaintiff did not need one. Defendant Vu told Plaintiff that he was going to order another injection and physical therapy because policy dictates his treatment. Plaintiff pleaded for other treatment, but Defendant Vu refused to listen and sent him back to his cell.

Plaintiff continued to experience pain over the next several months and went without further treatment despite requests.

Defendant Vu interviewed Plaintiff on July 2, 2012, in connection with the prior grievance. He again told Plaintiff that he should not have filed a grievance against him and that he would only get injections pursuant to policy.

Plaintiff feared that if he did not get the injections, then he would not get any treatment. On July 13, 2012, he received another steroid injection from Defendant Sheisha. Plaintiff asked for an MRI, but Defendant Sheisha told him that he was not going to tend to his "stupid complaints" and that he was tired of Plaintiff's grievances. Compl. 15.

On July 20, 2012, Plaintiff saw Defendant Bingamon, who diagnosed inflammation of the left shoulder and deterioration of his shoulder tendon. He told Plaintiff that he needed an MRI, but that he was not going to get involved in Plaintiff's problems with other doctors.

On August 11, 2012, Plaintiff submitted a Health Care Request Form complaining of extreme pain. He had been on the list for physical therapy for one month, but had not been seen. Plaintiff submitted another form on August 24, 2012, complaining of extreme pain and limited mobility. Plaintiff submitted a third request on August 29, 2012, explaining that earlier in the day, his shoulder gave out and he felt a shock of pain.

On October 5, 2012, Plaintiff told Defendant Vu that he had gone through the physical therapy evaluation but was not better. Defendant Vu told Plaintiff that it did not matter how he felt, because he would still need to have another injection before he would consider recommending an MRI.

Plaintiff went for two months without treatment and eventually requested help from a correctional officer after his shoulder tore when he was getting out of bed.

On November 27, 2012, Plaintiff submitted a Health Care Request Form complaining of extreme pain and asking for an MRI.

Plaintiff saw Defendant Vu on November 29, 2012, and explained that he had reinjured his shoulder. Defendant Vu told Plaintiff that he would order the last injection when he wanted, and that because he was in a "good mood," he would order an MRI. Compl. 17.

On December 5, 2012, Defendant Sheisha gave Plaintiff another injection.

Plaintiff received an MRI on December 12, 2012. The test revealed a large full-thickness tear of the tendon and atrophy, a partial tear of another tendon and other shoulder problems.

On January 10, 2013, Plaintiff was seen by Defendant Vu, who told Plaintiff that he had several tears in the muscles surrounding the rotator cuff and that he was sending Plaintiff to the prison orthopedist.

On January 22, 2013, Plaintiff saw the orthopedic surgeon. Dr. Lewis told Plaintiff that he had torn three of the four major muscles that make up the rotator cuff and that the atrophy rendered it inoperable. He expressed concern as to how long Plaintiff had been in pain and told Plaintiff that the steroid injections may have caused, or contributed to, the atrophy.

On February 8, 2013, Plaintiff saw specialist Dr. Heiser for a second opinion. He told Plaintiff that the injury was inoperable, and that he could alter the mechanics of the shoulder by fusing the bicep muscle to the supraspinatus muscle. Dr. Heiser did not recommend this, however, because of Plaintiff's age. Dr. Heiser told Plaintiff that these types of injuries need to be diagnosed as early as possible and properly treated.

**B.    LEGAL STANDARD**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007)) (quotation marks omitted); Conservation Force, 646 F.3d at 1242; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The Court must accept the factual allegations as true and draw all reasonable inferences in favor of the non-moving

party, Daniels-Hall, 629 F.3d at 998; Sanders, 504 F.3d at 910; Morales v. City of Los Angeles, 214 F.3d 1151, 1153 (9th Cir. 2000), and in this Circuit, pro se litigants are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor, Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012); Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir. 2012); Silva v. Di Vittorio, 658 F.3d 1090, 1101 (9th Cir. 2011); Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010).

C.  **DISCUSSION**

    1.        Eighth Amendment Deliberate Indifference

Plaintiff's complaint was screened and the Court determined that it stated a claim upon which relief may be granted. 28 U.S.C. § 1915A; Watison, 668 F.3d at 1112. Defendants present no arguments which persuade the Court that it committed clear error in determining that Plaintiff's Eighth Amendment claim was cognizable, or that any other grounds justifying relief from the screening order exist. See Ingle v. Circuit City, 408 F.3d 592, 594 (9th Cir. 2005) ("A district court abuses its discretion in applying the law of the case doctrine only if (1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result.").

To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. E.g., Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994); Thomas v. Ponder, 611 F3d 1144, 1150-51 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006); Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). This requires the prisoner to demonstrate (1) the existence of an objectively serious risk of harm and (2) that, subjectively, prison officials knew

of and disregarded that risk.  E.g., Farmer, 511 U.S. at 834, 847; Thomas, 611 F.3d at 1150-51; Foster, 554 F.3d at 812.

Defendants' motion is based on their contention that Plaintiff's allegations amount to nothing more than a difference of opinion regarding treatment.  Defendants argue that Plaintiff was treated numerous times during the time period at issue, and that in exercise of their professional judgment, Defendants conservatively managed Plaintiff's condition with examination, x-rays, medication and steroid injections.

The Court disagrees.  At the screening stage, Plaintiff's allegations are sufficient to state an Eighth Amendment deliberate indifference claim.  While Plaintiff may have received treatment throughout the time period at issue, it was the *way* in which treatment was rendered that distinguishes this case from a mere difference of opinion.  Plaintiff alleges that Defendants essentially made him withstand ineffective treatment longer than necessary because of their feelings towards him.  He alleges that for a period of two years, Defendants refused an MRI, continued with ineffective treatment and/or threatened to withhold all medical care for reasons unrelated to Plaintiff's medical condition.

Accordingly, Defendants' motion to dismiss based on failure to state a claim should be denied.

2.     Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity.  Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir.2001).  When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2)

whether the right at issue was "clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " Ashcroft v. al-Kidd, –––– U.S. ––––, ––––, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In this regard, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. The inquiry must be undertaken in light of the specific context of the particular case. Saucier, 533 U.S. at 201.

While Plaintiff may ultimately be unable to prove his claims, at the pleading stage, his allegations are accepted as true. If proven, Plaintiff's allegations are sufficient to establish that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment.

By 2010, the time that the alleged constitutional violations began, "the general law regarding the medical treatment of prisoners was clearly established," and "it was also clearly established that [prison staff] could not intentionally deny or delay access to medical care." Clement v. Gomez, 298 F.3d 898, 906 (9th Cir.2002). Any reasonable prison official should have known that continuing to provide ineffective treatment for reasons unrelated to Plaintiff's medical condition violates the Eighth Amendment.

Accordingly, Defendants' motion to dismiss based on qualified immunity should be denied.

Case 1:13-cv-00807-LJO-BAM   Document 38   Filed 10/15/14   Page 11 of 11

**D.     RECOMMENDATION**

For these reasons, the Court RECOMMENDS that Defendants' motion to dismiss be DENIED, and that Defendants be ORDERED to FILE a responsive pleading within thirty (30) days of adoption of these Findings and Recommendations.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with these Findings and Recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten (10) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

Dated:     **October 15, 2014**                          /s/ *Dennis L. Beck*
                                                                        UNITED STATES MAGISTRATE JUDGE

11